**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ELIZABETH A. WALLACE,
            Plaintiff,

      v.

DELTA AIR LINES, INC.,
PROSPECT AIRPORT SERVICES, INC.,
and
UNIFI AVIATION, LLC,

           Defendants.

**COMPLAINT**

Case No. 26-11704

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

Plaintiff Elizabeth A. Wallace ("Ms. Wallace" or "Plaintiff"), by and through her attorneys, Eisenberg & Baum, LLP, brings this action against Defendants Delta Air Lines, Inc. ("Delta"); Prospect Airport Services, Inc. ("Prospect"); and Unifi Aviation, LLC ("Unifi") (collectively, "Defendants"), and alleges as follows:

1. This civil action arises from the operational failure on October 31, 2024 by Delta Air Lines, Inc.; Prospect Airport Services, Inc.; and Unifi Aviation, LLC to provide legally required disability assistance to Ms. Wallace, a person with a non-apparent physical disability, at Detroit Metropolitan Wayne County Airport ("DTW"). Despite Ms. Wallace's advance arrangements, explicit requests, and compliance with every procedure each Defendant required of her, Delta failed to deliver the disability assistance it had

confirmed in writing; Prospect refused to provide that assistance when Ms. Wallace presented at its DTW service station, blamed her for Prospect's own failure to locate her, and told her it was "too late" with adequate time remaining before her flight; and Unifi, having acquired and assumed operational control of Prospect six months earlier, failed to implement the integrated training, communication, and oversight necessary to prevent the foreseeable failure Prospect's personnel committed. As a direct and proximate result of each Defendant's conduct, Ms. Wallace experienced public humiliation, emotional distress, and physical pain.

2. Ms. Wallace brings claims under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 et seq.; Michigan common law for negligence; and Michigan common law for breach of contract. The Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, and its implementing regulations at 14 C.F.R. Part 382, establish the prevailing industry standard of care for Defendants' obligations to passengers with disabilities in the air travel context and are invoked solely as evidence of that standard.

3. Ms. Wallace seeks compensatory damages, exemplary damages, injunctive relief, attorney's fees and costs, and all other relief this Court deems just and proper.

4.    Ms. Wallace's claims rest on generally applicable Michigan civil rights and tort norms and bear, at most, a tenuous, remote, or peripheral relation to Defendants' prices, routes, or services within the meaning of 49 U.S.C. § 41713(b)(1). This action does not challenge Delta's decision to transport Ms. Wallace, the price of her ticket, the route Delta selected, or the timing of any flight. Delta did transport Ms. Wallace to her destination. The conduct complained of is the manner in which Defendants executed their self-imposed undertaking to provide disability assistance, and the dismissive, accusatory, and humiliating treatment Plaintiff received at the hands of Defendants' personnel. Plaintiff does not assert any private cause of action under the Air Carrier Access Act or its implementing regulations. The Department of Transportation's enforcement framework under 49 U.S.C. § 41705 provides only administrative remedies and leaves intact private state-law remedies for the conduct alleged.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

Complete diversity of citizenship exists between Plaintiff and all named Defendants as set forth below.

6.	Plaintiff is a citizen of the State of Michigan.

7.	Defendant Delta Air Lines, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Atlanta, Georgia; Delta is therefore a citizen of Delaware and Georgia under 28 U.S.C. § 1332(c)(1).

8.	Defendant Prospect Airport Services, Inc. is a corporation incorporated under the laws of Illinois with its principal place of business in Des Plaines, Illinois; Prospect is therefore a citizen of Illinois under 28 U.S.C. § 1332(c)(1).

9.	Defendant Unifi Aviation, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Under controlling precedent, an LLC's citizenship is determined by the citizenship of each of its members.

10.	Unifi Aviation, LLC is wholly owned by Airco Aviation Services, LLC, which is, upon information and belief, a Delaware limited liability company with its principal place of business in Atlanta, Georgia. The members of Airco Aviation Services, LLC are Argenbright Holdings I, LLC and Delta Air Lines, Inc. In a December 21, 2018 transaction, Argenbright Holdings I, LLC acquired a 51% interest and Delta retained a 49% interest. Upon information and belief, Argenbright Holdings I, LLC is a Delaware limited liability

company with its principal place of business in Atlanta, Georgia, and its members are domiciled in the State of Georgia. Upon information and belief, no member of Unifi Aviation, LLC at any level of its ownership chain is a citizen of the State of Michigan.

11.   Plaintiff intends to seek limited jurisdictional discovery, including disclosures required by Federal Rule of Civil Procedure 7.1(a)(2), to confirm the full member-citizenship chain of all limited liability company defendants.

12.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred at DTW, which is located in Romulus, Michigan, within the Eastern District of Michigan, Southern Division.

13.   This action is timely. Plaintiff's claims under the PWDCRA and Michigan common-law negligence are subject to a three-year limitations period under Mich. Comp. Laws § 600.5805(2). Plaintiff's common-law breach-of-contract claim is subject to a six-year limitations period under Mich. Comp. Laws § 600.5807(9). The events giving rise to Plaintiff's claims occurred on October 31, 2024, and this action has been filed within each applicable limitations period.

## PARTIES

**A. Plaintiff**

14. Plaintiff Elizabeth A. Wallace is an individual and citizen of the State of Michigan.

15. Ms. Wallace has a physical impairment that substantially limits the strength, stability, endurance, and dexterity of her neck, back, shoulders, hands, wrists, and arms. As a result, she cannot safely lift, carry, pull, or maneuver heavy objects, including a standard rolling suitcase, without significant pain and risk of injury or symptom exacerbation

16. Ms. Wallace's impairment substantially limits her in the major life activities of lifting, carrying, reaching, and performing manual tasks, including the routine daily activities of lifting and carrying ordinary household and personal items, as compared to most people in the general population, within the meaning of 42 U.S.C. § 12102(2)(A) and Mich. Comp. Laws § 37.1103(d)(i)(B). Ms. Wallace's requirement of disability assistance to safely move a rolling suitcase is direct evidence of the substantial nature of her limitation.

17. Ms. Wallace's disability is non-apparent, meaning it is not immediately visible to an observer. The non-apparent character of Ms. Wallace's disability does not lessen its substance; the symbols and identifiers Ms. Wallace wore on October 31, 2024, including a sunflower lanyard and bracelet recognized

internationally as indicators of hidden disability and visible medical braces on both wrists, were available to Defendants' employees for observation.

18.  Ms. Wallace is a person with a disability within the meaning of the ADA, 42 U.S.C. § 12102, and the PWDCRA, Mich. Comp. Laws § 37.1103. Her disability is unrelated to her ability to utilize and benefit from a place of public accommodation within the meaning of Mich. Comp. Laws § 37.1103(d)(i)(B).

## B. Defendant Delta Air Lines, Inc.

19.  Defendant Delta Air Lines, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia.

20.  Delta is an "air carrier" within the meaning of 49 U.S.C. § 40102(a)(2) and is subject to the Air Carrier Access Act and 14 C.F.R. Part 382.

21.  Delta operates commercial passenger air service throughout the United States, including extensive operations at DTW, where Delta maintains a major hub.

22.  Delta operates physical, fixed facilities at DTW, including ticket counters, customer service desks, gate-area service positions, and the wheelchair-assistance reservation and intake operations. These facilities serve the traveling public and are extended, offered, or otherwise made available to the public within the meaning of Mich. Comp. Laws § 37.1301(a). The conduct complained of in this action occurred at, in, or in connection with these

physical Michigan facilities. Delta is therefore a "person" operating a "place of public accommodation" and a "transportation facility" under the PWDCRA. The PWDCRA contains no air-carrier carve-out and reaches the conduct of an air carrier when, as here, the conduct occurs at the carrier's physical facilities at a Michigan transportation terminal.

23. Delta Connection Flight 3926, the flight at issue, was held out to the traveling public and to Ms. Wallace as a Delta flight; was sold by Delta under its DL flight designator; was reserved, ticketed, and confirmed through Delta's reservation systems; and was operated under the Delta brand.

24. Ms. Wallace did not need or use a wheelchair. Her disability is unrelated to mobility. The assistance she needed for her October 31, 2024 flight was help with her carry-on bag, which her disability made it dangerous and painful for her to lift or carry. Delta's reservation systems offered no mechanism to request baggage assistance directly, and Delta's own customer service line for passengers with disabilities instructed Ms. Wallace that the only way to obtain any disability-related assistance with her bag was to reserve "wheelchair service." Delta accepted Ms. Wallace's resulting reservation, issued her a written email confirmation, and instructed her to check in with "any delta agent" upon arrival at DTW.

25. Delta Connection Flight 3926 was operated, on Delta's behalf, by a regional air carrier under a capacity purchase agreement, codeshare arrangement, or similar contractual relationship with Delta. Delta Connection flights at DTW are operated by one or more regional carriers, including Endeavor Air, Inc. (a wholly owned subsidiary of Delta), SkyWest Airlines, Inc., and Republic Airways, Inc.

26. The regional carrier that operated Flight 3926 did so pursuant to Delta's reservation and ticketing systems, under Delta's flight designator and brand, and subject to Delta's policies and procedures for disability assistance and passenger handling.

27. At all times relevant hereto, the regional operating carrier acted as Delta's agent for purposes of providing the air transportation that Delta sold and held out to the traveling public. Delta retained control over the customer-facing terms of the carriage, including the reservation and confirmation of disability-related accommodations.

28. Delta is responsible under principles of agency, respondeat superior for the acts and omissions of the regional operating carrier with respect to the conduct alleged herein. Plaintiff reserves the right to amend this Complaint to add the regional operating carrier as a named defendant if discovery reveals that direct liability against that entity is necessary to obtain complete relief.

## C. Defendant Prospect Airport Services, Inc.

29. Defendant Prospect Airport Services, Inc. is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Des Plaines, Illinois.

30. Prospect is a provider of aviation ground support services, including wheelchair and passenger assistance services, at airports in more than thirty cities throughout the United States.

31. Prospect is not an "air carrier" within the meaning of 49 U.S.C. § 40102(a)(2). Prospect holds no air carrier certificate, sells no air transportation, and is not certificated under 49 U.S.C. § 41101 or § 41102.

32. At all times relevant hereto, Prospect occupied and operated designated wheelchair service areas within the DTW terminal, including a staffed wheelchair services area inside the McNamara Terminal lobby at ticket counter positions #1 and #2 and a wheelchair services station directly adjacent to Door 2 in the Evans Terminal.

33. Prospect maintains a direct telephone line at DTW, (734) 921-7200, through which members of the public contact Prospect directly to request wheelchair assistance upon arrival at the departures curb or the Ground Transportation Center.

34. The Wayne County Airport Authority's official website expressly identifies Prospect Airport Services by name as the entity staffing the wheelchair service locations at DTW, publishes Prospect's direct telephone number for public use, and describes the scope of services Prospect provides from the curb through the passenger screening checkpoint and to the aircraft.

35. Prospect's service stations bear Prospect signage and branding and are staffed by employees wearing Prospect uniforms.

36. Prospect determines its own hours of operation, staffing levels, employee selection, employee discipline, training curricula, and customer service protocols at its DTW stations.

37. Prospect's policies on locating passengers, responding to disability requests, and handling service failures are developed and enforced by Prospect, not by any airline.

38. Prospect maintains its own institutional position on liability and customer disputes, as reflected in the October 21, 2025 written response from Prospect's Senior Director of Risk, Jo Ann Storie, addressed below.

39. Prospect occupies and operates physical, fixed service stations within DTW that are extended, offered, and otherwise made available to the public. Prospect is a "person" operating a "place of public accommodation" and a "transportation facility" within the meaning of Mich. Comp. Laws §

37.1301(a). The PWDCRA reaches Prospect's public-facing service operations at DTW regardless of any contractual relationship Prospect maintains with any airline.

40. Delta's own correspondence acknowledged that Prospect employees "represent" Delta's company.

### D. Defendant Unifi Aviation, LLC

41. Defendant Unifi Aviation, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Unifi Aviation, LLC is a wholly owned subsidiary of Airco Aviation Services, LLC.

42. Delta has confirmed the parent-subsidiary relationship between Airco and Unifi in its filings with the United States Securities and Exchange Commission, which identify Unifi Aviation, LLC as a wholly owned subsidiary of Airco Aviation Services, LLC.

43. Airco Aviation Services, LLC was formed in late 2018 as a joint venture between Argenbright Holdings I, LLC and Delta Air Lines, Inc. In a transaction announced November 27, 2018 and closed December 21, 2018, Argenbright Holdings I, LLC acquired a 51% interest in the joint venture and Delta retained a 49% interest.

44.     On October 31, 2024, Delta held a 49% ownership interest in Airco Aviation Services, LLC, accounted for using the equity method. Delta has reported this ownership interest in its filings with the United States Securities and Exchange Commission.

45.     Delta's ownership interest at all times relevant hereto was 49%. Plaintiff's allegations herein concerning the ownership and control of Unifi Aviation, Airco Aviation Services, LLC, and Argenbright Holdings I, LLC reflect the structure as it existed on October 31, 2024 and as confirmed in Delta's SEC disclosures. Plaintiff reserves the right to amend her allegations to reflect any subsequently disclosed changes in the ownership structure.

46.     Airco's board of directors consists of designees of Argenbright Holdings I, LLC and Delta Air Lines, Inc., with the majority of seats held by Argenbright designees and the remaining seats held by Delta designees.

47.     Delta thus holds a substantial minority equity interest in, and board-level governance participation in, the entity that controls Unifi and, through Unifi, controls Prospect.

48.     In or about April 2024, approximately six months before the events at issue, Unifi acquired Prospect Airport Services, Inc. Unifi publicly announced a 12-to-18 month plan to integrate Prospect's operations into Unifi's own. As of October 31, 2024, Unifi was in the middle of that integration period and had

assumed operational control over Prospect's wheelchair-services operations, including the operations at DTW.

49.   At all times relevant hereto, Unifi controlled the terms and conditions of employment at Prospect's DTW operations. Prospect employees were identified as part of the Unifi workforce, and Unifi publicly described Prospect employees as "joining the Unifi team."

50.   Unifi is not an air carrier within the meaning of 49 U.S.C. § 40102(a)(2).

51.   Through its operational control over Prospect's public-facing wheelchair-services operations at DTW, Unifi operates a "place of public accommodation" and a "transportation facility" within the meaning of Mich. Comp. Laws § 37.1301(a). Unifi is therefore a "person" subject to the PWDCRA with respect to its DTW operations.

52.   Unifi is vicariously liable for the acts and omissions of Prospect under principles of agency, respondeat superior, and parent-subsidiary control, and is also directly liable for its own failures in oversight, training, integration, and the implementation of policies and procedures governing disability assistance at DTW.

### E. Joint Venture and Agency Relationships

53.   Delta is directly liable for the conduct of its own employees and the implementation of its own policies, in addition to its vicarious liability for the

conduct of its agents. Delta's own customer service line employees instructed Ms. Wallace, before her flight, that she would have to misrepresent her need by requesting a wheelchair to obtain baggage assistance. Delta's own gate-area agent at DTW received Ms. Wallace's assistance request, instructed her where to wait, and never returned. Delta's own institutional policy, as Delta later admitted in writing, conditioned non-wheelchair disability assistance on the use of an unrelated wheelchair service. Each of these acts was performed by Delta's own personnel and reflects Delta's own institutional policy choices.

54. At all times relevant hereto, Prospect and its employees acted as agents of Delta for purposes of providing disability-related assistance to passengers, including Ms. Wallace.

55. Delta's December 12, 2024 correspondence confirmed the agency relationship by stating that the wheelchair attendant "doesn't work for Delta" but "does represent our company."

56. Delta held Prospect out to Ms. Wallace, and to the traveling public generally, as Delta's agent for the provision of disability assistance. By accepting Ms. Wallace's wheelchair-assistance reservation, sending her a written email confirmation, instructing her to check in with "any delta agent" at DTW, and routing the actual provision of that assistance through Prospect employees,

Delta clothed Prospect with apparent authority to act on Delta's behalf. Ms. Wallace reasonably relied on Delta's representations.

57. Delta and Argenbright Holdings I, LLC formed a joint venture, Airco Aviation Services, LLC, in December 2018. Their agreement reflects an intention to undertake the venture. Through Airco, they engaged in a joint undertaking. The venture is a single business enterprise organized for profit. Delta and Argenbright share in the profits and losses of the venture, with Delta's 49% equity interest accounted for using the equity method. The parties contributed property and operating capacity to the venture, including, as to Delta, transferred ground-services operations. Community of interest and control are reflected in Airco's shared board composition, with Argenbright-designated and Delta-designated board members.

58. Through this joint venture, Delta is a substantial minority owner of, and a corporate-governance participant in, the very entity responsible for providing disability assistance at DTW.

59. Delta is vicariously liable for the acts and omissions of Prospect and its employees, and of the regional operating carrier of Delta Connection Flight 3926, under principles of respondeat superior, agency.

60. Upon information and belief, Prospect's wheelchair-services contract at DTW is held with or for the benefit of Delta Air Lines, Inc., further reinforcing the agency relationship between Prospect and Delta.

### F. Detroit Metropolitan Wayne County Airport

61. Detroit Metropolitan Wayne County Airport is a transportation facility within the meaning of the PWDCRA, Mich. Comp. Laws § 37.1301(a). The PWDCRA's definition of "place of public accommodation" extends to "a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." Mich. Comp. Laws § 37.1301(a). The PWDCRA contains no air-carrier carve-out.

### FACTUAL ALLEGATIONS

### A. The Federal Regulatory Framework as Evidence of the Industry Standard of Care

62. The ACAA, 49 U.S.C. § 41705, prohibits air carriers from discriminating against otherwise qualified individuals on the basis of disability in the provision of air transportation.

63. The Department of Transportation's implementing regulations at 14 C.F.R. Part 382 impose specific obligations on carriers and their contractors,

including the duty to provide assistance to passengers with disabilities in moving through the airport terminal. 14 C.F.R. § 382.91(a).

64. Part 382 also requires assistance with stowing and retrieving carry-on baggage. 14 C.F.R. § 382.91(d).

65. Part 382 also requires that carriers ensure their contractors who provide services to passengers with disabilities comply with Part 382. 14 C.F.R. § 382.91.

66. Part 382 also requires that all personnel and contractors who deal with the traveling public be trained to proficiency regarding their obligations to passengers with disabilities. 14 C.F.R. § 382.141.

67. These regulations establish the prevailing industry standard of care applicable to air carriers and their contractors when providing disability assistance to passengers. They are pleaded as evidence of the standard of care under Michigan tort and civil rights law and not as the basis for any private federal cause of action.

68. On December 17, 2024, the Department of Transportation issued a final rule, "Ensuring Safe Accommodations for Air Travelers with Disabilities Using Wheelchairs," effective January 16, 2025, with phased implementation periods extending through June 17, 2026. The version of 14 C.F.R. Part 382 in effect at the time of the October 31, 2024 events alleged herein, and

applicable to the standard of care in this action, is the version that preceded the December 17, 2024 final rule. The amendments do not change the contractor-supervision, training, in-terminal-assistance, or carry-on-baggage-assistance requirements that govern this case.

### B. Ms. Wallace's Disability and Prior Interactions with Delta

69. Ms. Wallace has a physical impairment that substantially limits the strength, stability, endurance, and dexterity of her neck, back, shoulders, hands, wrists, and arms. As a result, she cannot safely lift, carry, pull, or maneuver heavy objects, including a standard rolling suitcase, without significant pain and risk of injury or symptom exacerbation.

70. Ms. Wallace's impairment is non-apparent: it is not immediately obvious to an observer looking at her.

71. On a prior Delta flight in July 2024, when Ms. Wallace asked a Delta flight attendant for help repositioning a carry-on bag that a friend/travel companion had placed for her, the flight attendant rudely scolded her, telling her that she must "register with Delta ahead of time" if she has a disability and needs assistance.

72. Through the July 2024 incident, Delta had actual notice that its disability accommodation policies and procedures were causing harm to passengers with non-apparent disabilities. Despite this notice, Delta took no corrective

action prior to October 31, 2024 to provide a means for passengers with non-apparent disabilities to obtain baggage assistance without requesting unrelated wheelchair service.

73. Heeding the July 2024 admonition, Ms. Wallace took extensive steps to ensure Delta was informed of her needs before her October 31, 2024 flight.

## C. Delta's Inadequate Accommodation System

74. Ms. Wallace attempted to request disability assistance through Delta's website and mobile application prior to her October 31, 2024 flight but found no option to request help specifically with carrying or stowing baggage.

75. Ms. Wallace then called Delta's customer service line for passengers with disabilities, explained her situation, and was told that the only way to guarantee assistance with her bag was to request wheelchair service, even though her disability is wholly unrelated to mobility and she does not use or need a wheelchair.

76. Delta's policy thus forced Ms. Wallace to misrepresent her actual needs and request a wheelchair service she did not need in order to obtain the baggage assistance she actually required.

77. The prevailing industry standard of care reflected in 14 C.F.R. § 382.91(d) requires carriers to assist passengers with stowing and retrieving carry-on baggage without conditioning such assistance on the use of unrelated services.

78.  Reluctantly, Ms. Wallace followed Delta's directive and submitted a reservation through Delta's wheelchair-service channel for her October 31, 2024 trip solely to obtain disability-related help with her carry-on bag. Ms. Wallace did not need or use a wheelchair.

79.  Delta accepted Ms. Wallace's reservation and sent her a written email confirmation of that reservation. In that confirmation email, Delta instructed Ms. Wallace to check in with "any delta agent" upon arrival at DTW.

80.  Ms. Wallace also obtained a sunflower lanyard and bracelet, an internationally recognized indicator of hidden disabilities, to wear during travel.

### D. The Events of October 31, 2024 at DTW

81.  On October 31, 2024, Ms. Wallace arrived at DTW well before her scheduled Delta Connection Flight 3926 from Detroit to Providence, which was scheduled to depart at approximately 11:00 a.m. Eastern Daylight Time. She was already checked in with a digital boarding pass and TSA PreCheck, wearing lanyard and bracelets with sunflower symbols, and with visible medical braces on both wrists.

82.  Upon arrival, and consistent with the written instructions in Delta's reservation confirmation email, Ms. Wallace immediately identified herself to a Delta agent near the security checkpoint, stated that she had a disability-assistance

reservation for a wheelchair, and explained that she did not need a wheelchair but did need help with her carry-on bag because of her disability.

83. The Delta agent appeared confused that a young woman who was walking unassisted would have a wheelchair-channel reservation, reflecting the assumption that a passenger who walks unassisted does not require disability assistance. Nonetheless, the agent told Ms. Wallace she would call for the assistance and directed her to stand and wait at a specified spot approximately ten feet from the TSA PreCheck entrance.

84. Ms. Wallace waited approximately 15 minutes at the location specified by the Delta agent. No one came to provide the disability-related baggage assistance she had reserved.

85. As her boarding time approached, Ms. Wallace could not find the original Delta agent. She asked another Delta employee, the one checking boarding passes at the TSA PreCheck entrance, for an update. That employee directed her to go directly to the wheelchair assistance desk, operated by Prospect, in another part of the terminal.

86. The wheelchair assistance desk was a considerable distance away. Ms. Wallace had no choice but to drag her own rolling suitcase to that location, the very activity that her disability makes dangerous and painful. Doing so

caused her significant pain in her arms, back, neck, and wrists, and increasing anxiety.

87. When Ms. Wallace reached the Prospect wheelchair-services station, she told the Prospect attendant on duty that she had been sent there by another Delta employee and that she had a disability-assistance reservation. Ms. Wallace did not need a wheelchair; the reservation was the channel Delta required her to use to obtain baggage assistance.

88. The attendant appeared reluctant to help, consistent with the pattern of skepticism Ms. Wallace encountered throughout the day because her disability is not apparent. Ms. Wallace had to insist that she needed the assistance she had requested.

89. Only after Ms. Wallace provided her name did the attendant's demeanor shift. The attendant said, "Oh, I know who you are. They couldn't find you."

90. The attendant thus knew that Ms. Wallace was a passenger who had a disability-related assistance reservation and that the request had gone unfulfilled.

91. Rather than promptly helping Ms. Wallace, the Prospect attendant began to interrogate her, asking accusatory questions such as whether she "didn't see anyone with a wheelchair," insinuating that Ms. Wallace was at fault for missing the assistance.

92. Ms. Wallace explained that she had waited exactly where the Delta agent instructed and that this was her first time requesting such assistance, so she did not know who or what to look for.

93. The Prospect attendant nevertheless responded that "they couldn't find you and now it's too late" to help, despite at least 30 minutes remaining before the flight's departure.

94. Shocked, Ms. Wallace pressed further, repeating to the attendant, "I have a disability and need help with my bag." The only response was a repeated, dismissive, "It's too late."

95. In disbelief, Ms. Wallace asked, "So it doesn't matter that I have a disability and requested assistance?" The Prospect attendant simply reiterated, "It's too late."

96. At this point, Ms. Wallace was overcome with frustration and despair, and burst into tears.

### E. Ms. Wallace's Struggle Through Security and Boarding

97. Forced to fend for herself, Ms. Wallace proceeded toward the security checkpoint, pulling her suitcase despite the physical pain it caused. She was crying openly, humiliated that she had done everything Delta and Prospect asked of her to arrange assistance, yet was being abandoned and blamed for their failure to accommodate her.

98. As Ms. Wallace approached the TSA PreCheck line, the Delta employee who had earlier directed her to the Prospect wheelchair desk asked whether she had received the help she needed. Through tears, Ms. Wallace told him that Prospect had refused to help her and said it was "too late."

99. The Delta employee responded that the situation was "messed up." Ms. Wallace then proceeded through security, not knowing whether anyone would help her.

100. Witnesses, including TSA agents and other passengers, observed Ms. Wallace in visible distress. TSA officers at the checkpoint stepped in to assist her when they realized neither Delta nor Prospect would. One officer helped lift her bag onto the conveyor for screening and another from the neighboring conveyor belt walked over and said "looks like you need a hug" and proceeded to hug her over the conveyor belt.

101. After she passed through the security scanner, the same Delta employee appeared on the other side. He told her to wait while he arranged for someone to cover his post. Ms. Wallace sat down at the security exit area, still crying, as other passengers streamed past her on the way to their flights. The Delta employee then returned, took her luggage, and escorted her to her gate.

102. Due to the delays caused entirely by Defendants' failures, the flight was already boarding when they arrived at the gate. The Delta employee stopped

the boarding process and escorted Ms. Wallace down the jet bridge, leaving her bag at the end to be gate-checked.

103. Ms. Wallace boarded the plane by herself, still crying, in full view of passengers who were waiting to board and those already seated. She was deeply mortified by the public spectacle that had been made of her simply trying to obtain a legally required accommodation.

## F. Delta's Inadequate Post-Incident Response

104. Following the incident, Ms. Wallace filed a complaint with Delta, which was assigned Case No. 11895457.

105. On December 12, 2024, Delta responded in writing to Ms. Wallace's complaint. In that response, Delta acknowledged that Ms. Wallace faced a "lack of assistance" and apologized for how she was treated.

106. In its December 12, 2024 response, Delta admitted that its "meet and assist" service, that is, assisting a passenger who does not need a wheelchair but does need other help, "is not a guaranteed service if not also associated with an additional service request such as a wheelchair." Delta's policy thus conditions disability assistance on the use of a wheelchair.

107. The prevailing industry standard of care reflected in 14 C.F.R. § 382.91(d) requires carriers to assist passengers with disabilities with stowing and

retrieving carry-on baggage without conditioning such assistance on the use of unrelated services.

108.  Delta further stated in its response that the wheelchair attendant "doesn't work for Delta" but "does represent our company," thereby acknowledging its agency relationship with Prospect. Delta made this statement notwithstanding that it holds a 49% ownership stake in the entity that controls Prospect and has board-level governance participation in its operations.

109.  Despite these admissions, Delta's response claimed that it had "insufficient information" to determine if a Part 382 violation occurred.

## G. Prospect's Denial of Responsibility

110.  Upon information and belief, Prospect is the entity that contracted with Delta to provide wheelchair and passenger assistance services for Delta-affiliated passengers at DTW.

111.  Prospect was acquired by Unifi in April 2024, approximately six months before the incident at issue. Delta holds a 49% ownership stake in Airco Aviation Services, LLC, which wholly owns Unifi, which in turn owns Prospect.

112.  In correspondence dated October 21, 2025, Prospect's Senior Director of Risk, Jo Ann Storie, stated that if Ms. Wallace "failed to follow the instructions to

come to the podium to get assistance from Prospect, unfortunately this is a failure on her part."

113. This response, issued by Prospect's own senior management and reflecting Prospect's own institutional position rather than Delta's, demonstrates Prospect's refusal to accept responsibility and its attempt to blame Ms. Wallace for its own failure to locate and assist her.

114. Delta's own email confirmation of Ms. Wallace's reservation instructed her to check in with "any delta agent" at DTW upon arrival. Ms. Wallace did exactly that. She approached a Delta agent near the security checkpoint and identified herself as a passenger with a disability-assistance reservation. That Delta agent directed her to wait at a designated spot near the TSA PreCheck entrance. Ms. Wallace was never told to go to the Prospect "podium."

115. Prospect's claim that Ms. Wallace "failed to follow the instructions to come to the podium" is contradicted by the written instructions Delta provided to Ms. Wallace.

116. Neither Delta nor Prospect communicated or coordinated with each other to ensure Ms. Wallace received the assistance she had requested.

## H. Ms. Wallace's Damages and Continuing Need for Assistance

117. As a direct and proximate result of Delta's, Prospect's, and Unifi's conduct, Ms. Wallace suffered and continues to suffer significant emotional distress, including humiliation, embarrassment, anxiety, and loss of trust in air travel.

118. As a direct and proximate result of Delta's failure to deliver the disability assistance it had confirmed in writing and Prospect's refusal to provide that assistance when Ms. Wallace presented at its DTW service station, Ms. Wallace was forced to drag her luggage without assistance, causing physical pain in her arms, back, neck, and wrists.

119. As a direct and proximate result of Delta's failure to deliver assistance and Prospect's refusal to provide assistance, Ms. Wallace suffered an exacerbation of her underlying physical condition.

120. As a direct and proximate result of Delta's, Prospect's, and Unifi's conduct, Ms. Wallace suffered a loss of dignity.

121. As a direct and proximate result of Delta's, Prospect's, and Unifi's conduct, Ms. Wallace has incurred and continues to incur economic costs, including the cost of altered travel arrangements undertaken to avoid the disability-assistance services provided by Delta and Prospect (and overseen by Unifi). These workarounds are available only when Ms. Wallace does not travel alone and impose burdens that are directly attributable to the discriminatory conduct of Delta, Prospect, and Unifi.

122. The physical pain and emotional injury Ms. Wallace suffered on October 31, 2024 was caused and complete before any employee of Delta, Prospect, or Unifi provided any assistance. The subsequent assistance Ms. Wallace ultimately received from a Delta employee, after she had already dragged her own suitcase, been refused assistance at the Prospect desk, and been subjected to public humiliation, did not undo or mitigate the injuries Delta's and Prospect's prior conduct had inflicted.

123. Ms. Wallace is a loyal Delta customer: a Silver Medallion member (previously Platinum and Gold status), with over 245,000 lifetime miles flown with Delta, and a Delta Amex Platinum cardholder.

124. DTW is the closest major commercial airport to Ms. Wallace's home and the airport she uses for substantially all of her air travel. Ms. Wallace travels through DTW on Delta-affiliated services multiple times each year for personal, family, and other purposes, and has concrete plans to travel through DTW on Delta-affiliated services within the next twelve months and on a continuing basis thereafter.

125. Since the October 31, 2024 incident, Ms. Wallace has been deterred from using Delta and Prospect disability assistance because of Defendants' failures and the resulting humiliation. She has been forced to alter her travel behavior by sharing a single bag with her travel companion, checking luggage she

would otherwise carry on, or relying on her partner or other travel companions to pull her bag. These workarounds are available only when she does not travel alone and impose additional burdens and costs directly attributable to Defendants' discriminatory conduct.

126. Ms. Wallace's physical impairments are permanent and degenerative; she will require disability-assistance services on every future trip; and she fully intends to use disability-assistance services through Delta and Prospect once those services are reformed to provide prompt, dignified, and reliable assistance. Absent injunctive relief, Ms. Wallace faces a real and immediate threat of being subjected to the same discriminatory treatment each time she travels alone through DTW.

## CLAIM I

*Violation of the Michigan Persons with Disabilities Civil Rights Act*
*Mich. Comp. Laws § 37.1302*
*(Against Defendant Delta Air Lines, Inc.)*

127. Plaintiff incorporates the allegations of paragraphs 1 through 126 as if fully set forth herein.

128. The PWDCRA, Mich. Comp. Laws § 37.1102(1), guarantees the right to "full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability."

129. Under Mich. Comp. Laws § 37.1301(a), a "place of public accommodation" includes a "business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." The PWDCRA contains no air-carrier carve-out.

130. Delta operates a transportation facility and a business whose services are offered to the public, including at DTW. Delta is therefore a "person" operating a "place of public accommodation" under the PWDCRA.

131. Under Mich. Comp. Laws § 37.1302(a), it is unlawful to "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from" those services.

132. Ms. Wallace is a person with a disability under the PWDCRA. Her disability is unrelated to her ability to utilize and benefit from Delta's air transportation services.

133. Delta denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to provide the disability assistance she reserved and requested.

134. Delta denied Ms. Wallace the full and equal enjoyment of its services because of her disability by conditioning assistance on the use of a wheelchair service unrelated to her needs.

135. Delta denied Ms. Wallace the full and equal enjoyment of its services because of her disability by subjecting her to dismissive and degrading treatment on the basis of her disability.

136. Delta denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to accommodate her disability as required by Mich. Comp. Laws § 37.1102(2).

137. Delta is responsible under principles of agency, respondeat superior for the acts and omissions of its contractors, including Prospect, and of the regional operating carrier of Delta Connection Flight 3926, with respect to the conduct alleged herein.

138. Plaintiff's PWDCRA claim arises under a generally applicable Michigan civil rights statute and does not seek to alter Delta's prices, routes, or services within the meaning of 49 U.S.C. § 41713(b)(1). The connection between this claim and Delta's prices, routes, or services is, at most, tenuous, remote, or peripheral. The willful, disability-based humiliation Plaintiff suffered is not a carrier service and was not reasonably necessary to the provision of any carrier service.

139. As a direct and proximate result of Delta's violations of the PWDCRA, Ms. Wallace suffered physical pain, tangible injury, emotional distress, humiliation, and loss of dignity. Plaintiff's compensatory damages cover her physical pain and tangible injuries.

140. Plaintiff's exemplary damages compensate for the willful, wanton, and reckless character of Delta's conduct in subjecting Ms. Wallace to public humiliation, accusatory interrogation, and dismissive treatment notwithstanding its knowledge that she had requested disability assistance. That conduct was voluntary, inspired feelings of humiliation, outrage, and indignity in Ms. Wallace, and demonstrated reckless disregard for her rights as a person with a disability, causing increased injury to her feelings beyond that compensable as ordinary mental distress.

141. Plaintiff is entitled to recover actual damages, exemplary damages, equitable and injunctive relief, and attorney's fees and costs under Mich. Comp. Laws § 37.1606.

## CLAIM II

*Violation of the Michigan Persons with Disabilities Civil Rights Act*
*Mich. Comp. Laws § 37.1302*
*(Against Defendants Prospect Airport Services, Inc. and Unifi Aviation, LLC)*

142. Plaintiff incorporates the allegations of paragraphs 1 through 126 as if fully set forth herein.

143.   Prospect operates a business at DTW providing passenger assistance services, including wheelchair and disability assistance, to the public. Prospect's services are extended, offered, sold, or otherwise made available to the public at a transportation facility. Prospect is therefore a "person" operating within a "place of public accommodation" under Mich. Comp. Laws § 37.1301(a).

144.   Unifi, as the acquiring and controlling company of Prospect, exercised control over Prospect's operations, training, policies, and procedures at DTW at the time of the incident. Unifi is independently liable under the PWDCRA for the discriminatory conditions at its DTW wheelchair service operations.

145.   Prospect denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to locate and provide the disability-related baggage assistance she had reserved through the channel Delta required her to use, despite knowing that her reservation was on file and unfulfilled.

146.   Prospect denied Ms. Wallace the full and equal enjoyment of its services because of her disability by blaming Ms. Wallace for Prospect's failure to locate her.

147.   Prospect denied Ms. Wallace the full and equal enjoyment of its services because of her disability by refusing to provide the disability-related baggage assistance she needed after Ms. Wallace identified herself and her disability at the Prospect service station.

148.  Prospect denied Ms. Wallace the full and equal enjoyment of its services because of her disability by dismissively telling Ms. Wallace it was "too late" despite adequate time remaining before her flight.

149.  Prospect denied Ms. Wallace the full and equal enjoyment of its services because of her disability by subjecting Ms. Wallace to accusatory and degrading treatment on the basis of her disability.

150.  Unifi denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to implement adequate policies and procedures to ensure that passengers with non-apparent disabilities who reserve disability assistance are located and served, even when they do not present at the Prospect service station.

151.  Unifi denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to establish adequate communication protocols between Prospect personnel and Delta to prevent passengers from being misdirected and abandoned.

152.  Unifi denied Ms. Wallace the full and equal enjoyment of its services because of her disability by failing to ensure that Prospect employees were trained to respond to passengers with disabilities with dignity rather than dismissiveness and blame.

153. The Prospect attendant's dismissive and accusatory treatment of Ms. Wallace, and the failure of any Prospect employee to locate Ms. Wallace at the location the Delta agent specified or to coordinate with Delta's gate-area agents, reflected a systemic absence of training and oversight by Unifi regarding the treatment of passengers with non-apparent disabilities. The breakdown was not an isolated lapse by a single employee but the predictable consequence of Unifi's decision to acquire Prospect, absorb its workforce, and assume operational control over its disability-services operations without implementing adequate training, communication protocols, or oversight during the announced 12-to-18 month integration period.

154. As a direct and proximate result of Prospect's and Unifi's violations of the PWDCRA, Ms. Wallace suffered and continues to suffer physical pain, tangible injury, emotional distress, humiliation, and loss of dignity.

155. Plaintiff's exemplary damages compensate for the willful, wanton, and reckless character of Prospect's conduct in dismissively informing Ms. Wallace it was "too late," interrogating her in an accusatory manner, and refusing to provide the assistance she had reserved. That conduct was voluntary, inspired feelings of humiliation, outrage, and indignity in Ms. Wallace, and demonstrated reckless disregard for her rights as a person with

a disability, causing increased injury to her feelings beyond that compensable as ordinary mental distress.

156. Plaintiff is entitled to recover actual damages, exemplary damages, equitable and injunctive relief, and attorney's fees and costs under Mich. Comp. Laws § 37.1606.

## CLAIM III

*Negligence*
*(Against Defendant Delta Air Lines, Inc.)*

157. Plaintiff incorporates the allegations of paragraphs 1 through 126 as if fully set forth herein.

158. Under Michigan law, Delta owed Ms. Wallace the general duty of reasonable care and the heightened duty of care owed by a common carrier to its passengers, which requires the carrier to exercise such diligence as would be exercised in the circumstances by a reasonably prudent carrier, with the carrier-passenger relationship and the passenger's dependence on the carrier informing what reasonable care requires.

159. Delta's duty of reasonable care under Michigan law extends to the manner in which Delta provides disability assistance to its passengers. Evidence of the prevailing industry standard for that assistance is reflected in the Department of Transportation's regulations at 14 C.F.R. Part 382, which the industry,

including Delta, observes as the prevailing standard. Those regulations address, among other things, assistance in moving through the airport terminal (14 C.F.R. § 382.91(a)), assistance with carry-on baggage (14 C.F.R. § 382.91(d)), and supervision of contractors who provide services to passengers with disabilities (14 C.F.R. § 382.91 and § 382.7). The federal regulations are referenced as evidence of the industry standard of care, not as the source of any private federal cause of action and not as displacing Michigan's independent common-law duties.

160. Delta breached its duty of care by failing to establish an adequate system for passengers with non-apparent disabilities to request and receive baggage assistance without requesting wheelchair service.

161. Delta breached its duty of care by failing to ensure that the assistance Ms. Wallace reserved was actually provided.

162. Delta breached its duty of care by failing to communicate Ms. Wallace's location to the disability-assistance provider whose services Delta had directed Ms. Wallace to reserve.

163. Delta breached its duty of care by failing to supervise or coordinate with its contractor, Prospect, to ensure the provision of assistance.

164. Delta breached its duty of care by failing to provide any alternative assistance when the original plan failed.

165. Delta breached its duty of care by admitting in its December 12, 2024 correspondence that its "meet and assist" service is "not a guaranteed service" without a wheelchair request, a policy that falls below the prevailing industry standard of care.

166. Delta is also vicariously liable for the negligence of the regional air carrier that operated Delta Connection Flight 3926 on October 31, 2024, which acted as Delta's agent in operating the flight Delta sold and held out to Ms. Wallace.

167. Delta is also vicariously liable for the negligence of Prospect and its employees, who acted as Delta's agents in providing disability assistance services. Delta's vicarious liability is reinforced by Delta's 49% ownership interest in Airco Aviation Services, LLC, the joint venture entity that wholly owns Unifi, which in turn owns Prospect, and by Delta's board-level governance participation in Airco.

168. As principal, Delta is liable under principles of respondeat superior, agency for the failures of its agents to ensure that disability assistance reserved for passengers on Flight 3926 was actually provided; to supervise or coordinate with the wheelchair-services contractor; to ensure the contractor was trained in compliance with the prevailing industry standard reflected in 14 C.F.R. § 382.141; and to provide alternative assistance when the original plan failed.

169. Plaintiff's negligence claim arises under generally applicable Michigan tort law and does not seek to alter Delta's prices, routes, or services within the meaning of 49 U.S.C. § 41713(b)(1). The claim addresses Delta's interactional misconduct, supervisory failures, and breaches of generally applicable duties of care, and seeks only state-law remedies. The dismissive, accusatory, and humiliating treatment Plaintiff suffered constitutes conduct beyond the scope of any normal carrier service, was not reasonably necessary to the provision of any service, and relates only tenuously to Defendants' prices, routes, or services.

170. As a direct and proximate result of Delta's negligence, including that for which Delta bears vicarious liability, Ms. Wallace suffered physical pain, emotional distress, humiliation, and other damages.

## CLAIM IV

*Negligence*
*(Against Defendants Prospect Airport Services, Inc. and Unifi Aviation, LLC)*

171. Plaintiff incorporates the allegations of paragraphs 1 through 126 as if fully set forth herein.

172. Under Michigan law, Prospect owed Ms. Wallace the general duty of reasonable care in the performance of its public-facing wheelchair and disability assistance services at DTW. Prospect's duty also arose from its undertaking to provide those services to members of the traveling public,

including Ms. Wallace. Evidence of the prevailing industry standard for that undertaking is reflected in the Department of Transportation's regulations at 14 C.F.R. Part 382, which address contractors who provide services to passengers with disabilities (14 C.F.R. § 382.91 and § 382.141). The federal regulations are referenced as evidence of the industry standard of care, not as the source of any private federal cause of action.

173.  Prospect's duty is further informed by the heightened duty applicable to its principal Delta. Prospect was contractually engaged by or for the benefit of Delta to perform Delta's common-carrier obligations to passengers with disabilities. A contractor performing a delegated common-carrier function owes the passenger the duty of care its principal owes.

174.  Prospect breached its duty of care by failing to locate and assist Ms. Wallace after she was identified as a passenger with a disability-assistance reservation.

175.  Prospect breached its duty of care by failing to communicate with Delta personnel regarding Ms. Wallace's location.

176.  Prospect breached its duty of care by refusing to provide assistance to Ms. Wallace when she presented at the Prospect desk and identified herself and her disability.

177.  Prospect breached its duty of care by blaming Ms. Wallace for the failure to locate her.

178. Prospect breached its duty of care by failing to adequately train its employees to assist passengers with non-apparent disabilities.

179. Unifi is vicariously liable for Prospect's negligence as Prospect's parent and controlling entity.

180. Unifi is also directly liable for its own negligence in failing to implement adequate training programs for Prospect employees at DTW on their obligations to passengers with non-apparent disabilities.

181. Unifi is also directly liable for its own negligence in failing to establish and enforce communication protocols between Prospect wheelchair attendants and airline partners to ensure passengers requesting disability assistance are located and served.

182. Unifi is also directly liable for its own negligence in failing to implement quality assurance or oversight mechanisms to ensure that its DTW wheelchair assistance operations met the prevailing industry standard of care.

183. Upon information and belief, at the time of the October 31, 2024 incident, Unifi had not completed or meaningfully begun the integration of Prospect's disability-assistance operations into Unifi's own operational framework, despite having publicly committed to a 12-to-18 month integration timeline beginning in April 2024. The absence of integrated training, communication protocols, and oversight mechanisms at DTW was a direct and foreseeable

consequence of Unifi's acquisition of Prospect and its assumption of operational control without corresponding implementation of adequate disability-service standards.

184. As a direct and proximate result of Prospect's and Unifi's negligence, Ms. Wallace suffered physical pain, emotional distress, humiliation, and other damages.

## CLAIM V

*Breach of Contract*
*(Against Defendant Delta Air Lines, Inc.)*

185. Plaintiff incorporates the allegations of paragraphs 1 through 126  as if fully set forth herein.

186. Ms. Wallace entered into a contract of carriage with Delta for transportation on Delta Connection Flight 3926 from Detroit to Providence on October 31, 2024. Delta sold the flight under its DL flight designator, ticketed it through Delta's reservation systems, and held the flight out to Ms. Wallace under the Delta brand.

187. In connection with that contract, and pursuant to Delta's own policies and procedures for passengers with disabilities, Ms. Wallace submitted a reservation through Delta's wheelchair-service channel to obtain the disability-related baggage assistance she needed at DTW for the October 31,

2024 flight. Ms. Wallace did not need or use a wheelchair; the wheelchair-service channel was the only mechanism Delta offered to reserve disability-related assistance with her bag.

188. Delta accepted that reservation and sent Ms. Wallace a written email confirmation. The confirmation instructed Ms. Wallace to check in with "any delta agent" upon arrival at DTW.

189. Delta's Domestic General Rules Tariff (Contract of Carriage), in Rule 6(I), expressly commits Delta to provide, upon request, the following services to a Person with a Disability: "(1) assistance with registration at the check-in counter; (2) assistance in proceeding to the boarding area; (3) assistance in boarding and deplaning; (4) assistance in stowing and retrieving carry-on baggage and retrieving checked baggage" among others. Rule 6(I)(4) is the contractual undertaking on which Ms. Wallace relied.

190. Delta's Contract of Carriage, in Rule 3, defines "Person with a Disability" as "any person who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment," further defined as required by applicable law, including 14 C.F.R. § 382.3. Ms. Wallace is a Person with a Disability within the meaning of the Contract of Carriage.

191. Delta's Contract of Carriage, in Rule 6(K), further commits that "Where a Person with a Disability requests assistance in boarding or seating or in stowing carry-on baggage, Delta will allow the passenger to board the aircraft in advance of other passengers where time permits."

192. Ms. Wallace performed all conditions, covenants, and promises required of her under the Contract of Carriage. She arrived at DTW well before her scheduled flight; she followed Delta's written instructions and checked in with a Delta agent upon arrival; she identified herself as a passenger with a disability-assistance reservation; she requested assistance with her carry-on bag; and she waited at the location specified by the Delta agent.

193. Delta breached Rule 6(I)(4) of the Contract of Carriage by failing to provide Ms. Wallace, upon her request and reservation, with the assistance in stowing and retrieving carry-on baggage that the Contract of Carriage commits Delta to provide.

194. Delta itself acknowledged this breach in its December 12, 2024 correspondence, which conceded a "lack of assistance," apologized for how Ms. Wallace was treated, and admitted that Delta's "meet and assist" service is "not a guaranteed service if not also associated with an additional service request such as a wheelchair." Delta's acknowledged conditioning of Rule 6(I)(4) baggage assistance on a wheelchair request finds no support in the

Contract of Carriage itself, which does not condition the obligation to provide baggage assistance on any concurrent wheelchair-service request.

195. Plaintiff's breach-of-contract claim rests on Delta's self-imposed contractual obligations to her in the Contract of Carriage and does not seek to enlarge those obligations beyond their terms.

196. Delta's Contract of Carriage, in Rule 24, provides that "any and all matters arising out of or relating to the Contract of Carriage and/or the subject matter hereof shall be governed by and enforced in accordance with the laws of the United States of America and, to the extent not preempted by Federal law, the laws of the State of Georgia." Plaintiff's breach-of-contract claim against Delta is asserted under Georgia law as required by the Contract of Carriage.

197. As a direct and proximate result of Delta's breach of Rule 6(I)(4), Ms. Wallace suffered direct and foreseeable damages, including physical pain from being forced to lift, pull, and carry her own bag without the assistance Delta had contracted to provide, the economic costs of altered travel arrangements undertaken since to avoid further reliance on Delta's breached undertaking, and other damages flowing directly from Delta's failure to perform the bargained-for accommodation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Elizabeth A. Wallace respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally where applicable, and award the following relief:

a.  Compensatory damages against Delta, Prospect, and Unifi in an amount to be determined at trial, including damages for physical pain, emotional distress, humiliation, loss of dignity, and all other injuries sustained;

b.  Exemplary damages against Delta, Prospect, and Unifi under Claims I and II in an amount sufficient to compensate for the willful, wanton, and reckless character of the conduct described herein;

c.  Contract damages against Delta under Claim V in an amount to be determined at trial;

d.  Injunctive and equitable relief pursuant to Mich. Comp. Laws § 37.1606 and the Court's general equity powers, requiring Delta to establish an accessible, guaranteed system for passengers with non-apparent disabilities to request and receive baggage assistance without being forced to request wheelchair service; to implement enhanced training for all customer service agents, flight attendants, and contractors on non-apparent disabilities and their obligations under applicable law; and to improve

internal communication protocols to ensure passengers who request disability assistance are not abandoned;

e. Injunctive and equitable relief pursuant to Mich. Comp. Laws § 37.1606 and the Court's general equity powers, requiring Prospect and Unifi to modify their policies, practices, and procedures to ensure passengers with non-apparent disabilities receive prompt, dignified assistance; to implement enhanced training for all wheelchair attendants and disability assistance personnel; and to establish adequate communication protocols with airline partners to prevent passengers from being abandoned or misdirected;

f. Attorney's fees, costs, and expenses of this action pursuant to Mich. Comp. Laws § 37.1606 and as otherwise permitted by applicable law;

g. Pre-judgment and post-judgment interest as allowed by law; and

h. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 24, 2026

Respectfully submitted,

/s/ Andrew Rozynski
Andrew Rozynski, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse

New York, NY 10003
Telephone: (212) 353-8700
Facsimile: (917) 591-2875
Email: arozynski@eandblaw.com
(NY# 5054465)